## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALEXIS RACHWALSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-02138-TWP-TAB |
| | ) | |
| PAMELA BONDI in her official capacity as | ) | |
| Attorney General of the United States and | ) | |
| Department of Justice, | ) | |
| KASH PATEL in his official capacity as Director | ) | |
| of the Federal Bureau of Investigation,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment (Filing No. 35) filed by Defendants Pamela Bondi, in her official capacity as Attorney General of the United States, and Kash Patel, in his official capacity as Director of the Federal Bureau of Investigation ("FBI") (collectively, "Defendants"). Plaintiff Alexis Rachwalski ("Rachwalski") initiated this action alleging claims of sex-based discrimination and retaliation discrimination, in violation of Title VII of the Civil Rights Act of 1964; and disability discrimination under the Rehabilitation Act, culminating in constructive discharge (Filing No. 2 at 7–8). For the reasons explained below, summary judgment is **granted**.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Rachwalski as the non-

---

[1] **The Clerk is directed** to correct the docket of this case and remove Defendant Merrick Garland and substitute Pamela Bondi as the current Attorney General of the United States; and remove Defendant Christopher Wray and substitute Kash Patel as the Director of the Federal Bureau of Investigation.

moving party. *See Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

From 2013 until October of 2019, Rachwalski worked in a law enforcement capacity in the state of Illinois. On October 27, 2019, she began a two-year probationary period as a Special Agent with the FBI (Filing No. 42 at 2). Rachwalski graduated from the FBI's Basic Field Training Course on March 17, 2020, and was assigned to the Indianapolis Field Office as her first duty station (Filing No. 42 at 2). Special Agent Chelsea ("Chelsea") (female), Special Agent Poppelriter ("Poppelriter") (male) and 2 other males who graduated with Rachwalski were also given the Indianapolis Field Office as their posts (Filing No. 41-3).

Rachwalski reported to the Indianapolis Field Office on March 25, 2020, and was assigned to the Special Operations Group ("SOG") (Filing No. 35-2 at 4). Prior to Rachwalski reporting, Assistant Special Agent in Charge Holdeman ("Holdeman") approached Supervisory Special Agent Monahan ("Monahan"), who was the supervisor of the Public Corruption Squad, carrying two employee profiles—one of Rachwalski and one of Chelsea (Filing No. 41-5 at 4:7–17). Holdeman gave Monahan the choice between Rachwalski and Chelsea for his squad. *Id*. Monahan consulted with Special Agent Carlson, who would be training the new squad member, and the two of them chose Chelsea because they felt she was better suited than Rachwalski for investigating police officers, which is the Public Corruption squad's main assignment. *Id*. at 12:12–14:17. Holdeman recommended Rachwalski to work in the SOG, as it was understaffed (Filing No. 41-3 at 5). Because the SOG was regularly understaffed, it suffered from a stigma of being an undesirable assignment (Filing No. 35-17 at 4).

On March 13, 2020, in the wake of the SARS-Covid2 outbreak, then President Donald Trump declared a National Emergency. So, when Rachwalski reported to the Indianapolis Field

Office in late March of 2020, employees were operating in a telework capacity due to the pandemic (Filing No. 35-2 at 5). Special Agent O'Neal ("O'Neal"), the supervisor of the SOG, learned that Rachwalski was unhappy about her assignment (Filing No. 35-17 at 5.) O'Neal wanted to welcome her, so he set up a meeting to provide Rachwalski with administrative paperwork, give her a positive description of the group, and let her know that her assignment was not a punishment. *Id.* at 4–5.

O'Neal asked Rachwalski to meet at her apartment to sign paperwork and receive FBI property, but she was not comfortable with him being in her apartment. *Id.* So, she had him meet her in the lobby of her apartment building. *Id.* During their conversation at her apartment building, O'Neal asked Rachwalski about her relationship status and told her that the Indianapolis Field Office was a terrible place to meet a husband, because most agents were married. *Id.* Rachwalski then told him she had a boyfriend, and the conversation ended. *Id.* This conversation made her uncomfortable. *Id.*

On May 15, 2020, O'Neal asked to stop by Rachwalski's apartment to drop off N-95 face masks for her to distribute to the other squad members. *Id.* at 6. O'Neal's request did not make sense to Rachwalski as another squad member lived much closer to him, and she lived in a different part of the Indianapolis area. *Id.* Rachwalski interpreted O'Neal's request as an opportunity to be in her presence and that he had some personal interest in her beyond work. *Id.* Rachwalski told O'Neal that she was not at home. *Id.*

During June and July of 2020, Rachwalski received text messages on multiple occasions from O'Neal. *Id.* On one occasion, O'Neal was out socializing with other employees and suggested that Rachwalski join him. *Id.* Rachwalski felt these text messages were inappropriate because O'Neal was married to another FBI employee. *Id.* at 6–7. Rachwalski did not advise O'Neal or

other management that she felt uncomfortable with O'Neal's actions due to her probationary status with the FBI. *Id*. at 7.

On July 21, 2020, Rachwalski advised Special Agent Argo ("Argo"), a SOG Team Leader, about O'Neal's text messages and how they made her uncomfortable. *Id*. at 7. Upon being informed of the text messages, Argo stated that Rachwalski should not go to O'Neal's office unaccompanied and that another team member would go with her any time she had to meet with O'Neal. *Id*. Argo also thought the texts included innuendo and considered them to be borderline inappropriate, especially since Rachwalski was a new agent (Filing No. 41-7 at 5).

In the summer of 2020, Rachwalski informed Special Agent Delcoco about O'Neal's text messages, (Filing No. 41-8 at 4), and Delcoco told Rachwalski to report the incidents because he believed it might not have been the first time O'Neal had done something similar. *Id*. at 5.

In July of 2020, Rachwalski and the other SOG agents were assembled when the topic of squads was discussed (Filing No. 41-7). Special Agent Pekala ("Pekala") stated that he had knowledge about how Rachwalski had been assigned to SOG (Filing No. 35-2). Pekala explained that the Public Corruption squad chose Chelsea over Rachwalski because they did not want a "big butch lesbian cop" telling them how to run their investigations. *Id*. Another Special Agent told Rachwalski that it is okay if she is a lesbian to which she responded that she is not (Filing No. 41-6 at 4:19–22).

On July 28, 2020, O'Neal sent an email to all agents in the SOG informing them that the Indianapolis Field Office was required to send two agents on a two-month temporary duty assignment in Chicago to investigate violent crime and that he was to submit one name (Filing No. 35-8 at 1). In the email, O'Neal also stated that all agents were eligible to go except for Rachwalski, because he was told that new agents could not go. *Id*. However, the Indianapolis Field Office did

not have a policy prohibiting new agents from working temporary duty assignments (Filing No. 41-10 at 4:16–19). Later that same day, O'Neal sent an email to the same agents stating "You're all off the hook for CG canvass thanks to [Rachwalski]. Front office has waived the new agent prohibition for her based on their confidence in her and her prior experience . . ." (Filing No. 35-8 at 2). Rachwalski was selected and participated in the 60-day Chicago assignment. After she returned, the Chicago Gang Investigations Sergeant sent a letter of commendation praising Rachwalski's assistance in the operation (Filing No. 41-13).

On November 12, 2020, during firearm training, Rachwalski injured her right shoulder resulting in a torn labrum. After researching surgeons in Indiana, she selected a surgeon in Chicago based on his credentials and underwent shoulder surgery in Chicago on January 12, 2021 (Filing No. 35-2 at 9). On January 21, 2021, Erin LaBuz ("LaBuz") (female) became Rachwalski's supervisor. *Id*. Rachwalski advised LaBuz that she would be on medical restrictions for approximately nine months due to her shoulder surgery. *Id*. Rachwalski was placed on telework status in February 2021, and was allowed to telework from Chicago, so that she could attend physical therapy and post-surgical medical appointments in Chicago. *Id*. at 9–10.

On March 29, 2021, Rachwalski received an email that she was being transferred to C-3 squad, and that Special Agent Brooks ("Brooks") (male) would be her new supervisor. She was told that her report date would be sometime in April-May of 2021 "upon physically ready." (Filing No. 41-21). On April 25, 2021, Brooks telephoned Rachwalski and welcomed her to C-3 (Filing No. 35-2 at 10). Rachwalski advised Brooks that she had not yet been cleared to return to work and had a follow-up evaluation with her doctor on May 10, 2021. *Id*. Brooks became upset and told Rachwalski that she needed to get cleared so she could be more beneficial to the squad. *Id*.

At her May 10, 2021, evaluation, Rachwalski's doctor requested that she continue physical therapy for six more weeks and remain on telework status in Chicago. *Id*. When Rachwalski conveyed her limited status to Brooks, he stated, "[y]our doctor doesn't dictate where you work" and told Rachwalski that she may still have to return to the office as the decision was up to management. *Id*. at 10–11. Brooks offered to transport Rachwalski to and from work and told her it was better for her to be in the office, where she could assist her squad mates in a face-to-face manner. *Id*. at 11. Rachwalski felt pressured as she was caught between her employer's expectations and her doctor's recommendations which led to her becoming emotional and crying during this conversation with Brooks. *Id*. Brooks apologized to Rachwalski for not providing her with better support, stated they were getting off on the wrong foot, and then approved her continued telework status from Chicago. *Id*.

On May 11, 2021, Rachwalski attended a squad meeting telephonically where Brooks advised the squad of her continued telework status, and then instructed the other agents to provide her with assignments she could do remotely. *Id*. On June 21, 2021, Rachwalski returned to the Indianapolis Field Office where she met her field training agent, Agent Madtson ("Madtson") (female). *Id*. at 12.

On August 3, 2021, Rachwalski advised Brooks that she had been medically cleared for full duty. Brooks told her to inform the squad members that her medical restrictions were lifted so they could request assistance from her. *Id*. at 13. Rachwalski felt this directive was embarrassing and she did not want to discuss any medical information with her co-workers, so she chose not to comply with Brooks' instructions, and instead, began volunteering when assistance was requested. *Id*.

In August 2021, Madtson raised concerns to Brooks about Rachwalski wearing a jersey and baseball cap with white tennis shoes to the office, and how Madtson believed such attire to be unprofessional (Filing No. 41-28 at 9). Madtson called Rachwalski and counseled her on her attire at the direction of Brooks. *Id*. Rachwalski then sent an email to Brooks on the same day but did not copy Madtson (Filing No. 35-19). In her email, Rachwalski requested a copy of the dress code policy, and told Brooks that she believes she dresses more appropriately than the others in the office. *Id*. Rachwalski then acknowledged that she may have misunderstood casual Friday and will no longer wear ball caps and jerseys to work. *Id*. Brooks has never brought up a dress code policy with another employee besides Rachwalski (Filing No. 41-23 at 14:21–15:5).

On September 1, 2021, Rachwalski met with Brooks, and he stated that the FBI did not have a specific dress code (Filing No. 35-2 at 15). Brooks denied that he had raised concerns about her attire, but if Madtson told her she needed to change her attire, then she needed to follow such direction. *Id*. Brooks also cautioned Rachwalski about sending a similar email again and told her he had not been the best supervisor but wanted to put that all behind them. *Id*.

Rachwalski acknowledged in her employment agreement that access to FBI information is a position of special trust, that agents are obligated to protect such information from unauthorized disclosure as a condition of employment, that they cannot reveal such information to unauthorized recipients without prior official written authorization, and that doing so may constitute cause for dismissal (Filing No. 35-10). Further, disclosures made by FBI applicants to agents conducting Personnel Security Interviews are governed by the Privacy Act and are protected from unauthorized disclosure (Filing No. 35-11; 5 U.S.C. § 522(a)).

On August 28, 2021, Rachwalski and her fiancé attended a gathering hosted by other Special Agents to honor task force officers and others involved in a successful search warrant

takedown (Filing No. 41-30). At the event, Rachwalski saw a male applicant who was scheduled to attend basic training and he approached her and asked, "do you remember me" (Filing No. 35-2 at 16). Rachwalski had conducted this applicant's Personnel Security Interview in 2020 where the applicant disclosed information Rachwalski considered a potential criminal act. *Id*. Rachwalski then told one of the Special Agents that she believed she made a mistake in reporting the disclosure because the applicant had passed his interview and was hired. *Id*. Rachwalski then spoke with multiple others about the disclosure including LaBuz, Argo, Pekala, and an Intelligence Analyst. (Filing No. 35-3 at 6:24–12:17).

On September 7, 2021, Brooks called Rachwalski into his office and advised her he had learned that she disclosed confidential information (Filing No. 35-2 at 17). Brooks told Rachwalski that he attempted to keep the disclosure incident between them, however, executive management was now involved. *Id*.

On September 8, 2021, Rachwalski requested telework for the Friday after a Thursday medical appointment in Chicago. *Id*. Brooks explained that he would approve telework for maintenance services calls, but otherwise, Rachwalski needed to take annual leave for time in Chicago to attend a medical appointment. *Id*. at 18.

On September 13, 2021, Brooks told Rachwalski that management required him to document her violation of confidentiality in a Performance Quick Feedback ("PQF"), and he did so that day. *Id*. In the PQF, Brooks noted that Rachwalski had showed a lack of judgment and emotional maturity for failing to keep sensitive information confidential. *Id*. at 19. Brooks also reported that Rachwalski failed to respond professionally to Madtson after being counseled on her attire. *Id*. Brooks further noted that Rachwalski was failing her probationary suitability standards,

which could result in her removal from FBI employment. *Id*. When Rachwalski read the PQF, she thought she may be suspended but did not believe she would be terminated. *Id*.

On October 8, 2021, the Special Agent in Charge informed Rachwalski that she was being recommended as not having successfully passed her probationary period and gave her the option to resign. Rachwalski asked to speak with her lawyer and was given 15 minutes to respond. After unsuccessfully attempting to speak with her lawyer, she elected to resign, and the Special Agent said, "Good choice." *Id*. at 3. Rachwalski then signed a letter of resignation and non-disclosure agreement. *Id*.

On October 18, 2021, Rachwalski initiated Equal Employment Opportunity Commission ("EEOC") contact concerning claims identical to those in this lawsuit (Filing No. 2 at 6). On May 2, 2022, Rachwalski filed a formal complaint of discrimination with the Defendants and an investigation into her complaint was conducted. *Id*. On February 27, 2023, a hearing was commenced on these allegations before an administrative law judge of the EEOC. *Id*. On February 28, 2023, Rachwalski withdrew her request for a hearing and requested a Final Agency Decision from the Department of Justice. *Id*. On March 27, 2023, the EEOC issued a Hearing Dismissal Order. *Id*. The next day, the Department of Justice's Complaint Adjudication Office issued a memo indicating that it would be issuing a Final Agency Decision. *Id*. Rachwalski did not receive a Formal Agency Decision and on November 29, 2023, filed this lawsuit (Filing No. 2).

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.    DISCUSSION

Defendants argue they are entitled to judgment as a matter of law for four reasons: (1) many of Rachwalski claims are time barred because she did not initiate EEOC contact within 45 days;

(2) she cannot establish a prima facie case of discrimination; (3) the FBI's actions, including its decision to terminate Rachwalski, were not pretext for discrimination because they were motivated by legitimate, non-discriminatory reasons; and (4) she cannot establish causation for any of her claims (*See* Filing No. 36).

Rachwalski brings three distinct claims in her Complaint: (First) Sex-Based Discrimination in which the Defendants subjected her to harassment and a hostile work environment based on her sex; (Second) Retaliation Discrimination in which the Defendants subjected her to harassment and a hostile work environment due to her prior protected EEOC activity; and (Third) Disability Discrimination under the Rehabilitation Act (Filing No. 2 at 7–8). In both her claim for sex-based discrimination and retaliation, Rachwalski alleges a hostile work environment, so the Court will address this allegation as a separate claim.

**A.    Disability Discrimination Claim**

In a footnote in her Response to this motion, Rachwalski abandons her claim for Disability Discrimination under the Rehabilitation Act "because her disability was not permanent, and this claim appears inextricably intertwined with her sex: female." (Filing No. 42 at 26). Accordingly, summary judgment is **granted** as to the Disability Discrimination claim.

**B.    Sex Discrimination Claim**

Rachwalski alleges the Defendants unlawfully removed her from her position due to her sex in violation of Title VII. *Id.* "Title VII prohibits employers from discriminating against employees on the basis of sex or gender." *Farrell v. Butler Univ.*, 421 F.3d 609, 612 (7th Cir. 2005) (citing 42 U.S.C. § 2000e-2(a)(1)). There are two pathways for Rachwalski to succeed on a discrimination claim. She can "establish a dispute of material fact under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Gamble v. Cnty.*

*Of Cook*, 106 F.4th 622, 625–626 (7th Cir. 2024). She can also succeed if the evidence, when considered as a whole, would permit a reasonable factfinder to conclude that the Defendants discriminated against her because she is a woman. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). In her briefing, Rachwalski asserts an argument premised on comparing herself to a similarly situated male co-worker. Therefore, the Court will analyze her claims under both pathways.

### 1. **Failure to Initiate EEOC contact within 45 days**

The Court must first address Defendants' timeliness argument. "Federal employees who seek to assert Title VII claims must exhaust the administrative remedies available to them in a timely fashion before they may assert their claims in a lawsuit." *Ester v. Principi*, 250 F.3d 1068, 1072 (7th Cir. 2001) (citing 42 U.S.C. § 2000e-16(c)); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976); *Rennie v. Garrett*, 896 F.2d 1057, 1059 (7th Cir. 1990)). "29 C.F.R. § 1614.105 sets forth those federal employees 'who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must . . . initiate contact with a Counselor [from the EEOC] within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.' Failure to do so equates to the violation of a statute of limitations and, notwithstanding extenuating circumstances, would bar a federal employee from pursuing any action against the government for violation of Title VII of the Civil Rights Act of 1964." *Smith v. Potter*, 445 F.3d 1000, 1006–1007 (7th Cir. 2006) (quoting 29 C.F.R. § 164.105), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Defendants argue that allegations occurring before September 3, 2021, are barred because Rachwalski did not initiate EEOC contact in a timely fashion as required by 29 C.F.R.

1614.105(a)(1) (Filing No. 36 at 9-10). Rachwalski concedes that her claims under ¶15(a)–(b) and ¶16(a)–(c) of her Complaint are not actionable due to being time-barred (Filing No. 42 at 29). The Court agrees that those claims are time barred, but also finds that her claims under ¶16(d)–(i) are time barred as they are not within the 45-day timeframe which she was required to initiate EEOC contact (Filing No. 2 at 4–5).

Rachwalski initiated EEOC contact on October 18, 2021. Accordingly, only those allegations occurring on or after September 3, 2021, are not barred by 29 C.F.R. 1614.105(a)(1).[2] The allegations occurring after September 3, 2021, are the following: (1) Brooks accusing her of violating confidentiality; (2) the related PQF for alleged breach of confidentiality; (3) her request for telework in Chicago being denied; (4) Brooks directing Rachwalski to use sick leave for her absence; and (5) the circumstances which caused her to resign in lieu of termination by Defendants (Filing No. 2 at 5–6). All other claims in Rachwalski's Complaint are time-barred under 29 C.F.R. 1614.105(a)(1) and Defendants' Motion for Summary Judgment is **granted** for those claims.

### 2. *McDonnell Douglas* **Framework**

The *McDonnell Douglas* framework "requires the plaintiff to carry the burden of production on a four-part prima facie case." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017). Rachwalski must first show that (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better treatment. *Id*. If Rachwalski makes this prima facie showing, the burden shifts to the Defendants to come forward with a legitimate, nondiscriminatory reason for the challenged employment action. *Id*. If the Defendants do this, then the burden shifts back to Rachwalski to

---

[2] September 3, 2021, is 45 days before October 18, 2021.

establish a genuine dispute of fact about whether Defendants' reasoning was pretext for discrimination. *Id*. "'Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.'" *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) (quoting *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)) (internal quotation marks omitted). "Summary judgment for [Defendants] is appropriate if [Rachwalski] fails to carry [her] burden to establish a prima facie case or is unable to show a genuine dispute about whether the neutral reason advanced by the [Defendants] was merely pretextual." *Id*.

Defendants do not dispute that Rachwalski meets element one—that she is a member of a protected class, and element three—that her termination constitutes an actionable adverse action (Filing No. 36 at 11). They argue however, that Rachwalski's discrimination claims fail under the *McDonnell Douglas* framework because she cannot satisfy elements two or four of her prima facie case of discrimination and she is unable to show pretext. *Id*. at 10-15.

### a.  Prima Facia Case

Defendants argue Rachwalski failed to meet her employer's expectations because she disclosed confidential information about a fellow co-worker violating FBI policy. *Id*. at 10. Rachwalski makes no argument that she performed to her employer's expectations and the Court finds that she did not.

Rachwalski made an unauthorized disclosure of confidential information in violation of the FBI's policy, (Filing No. 35-11), her employment agreement, and the Privacy Act. 5 U.S.C. § 552(a). Rachwalski does not dispute that she made an unauthorized disclosure of confidential information concerning another employee and admitted that she expected to be suspended for a week up to 30 days for her disclosure (Filing No. 35-1 at 163:21–164:5). Her employment agreement states that violations of the employment agreement, including unauthorized disclosure

of confidential information, "may constitute cause for revocation of [her] security clearance, subject [her] to criminal sanction, disciplinary action by the FBI, including dismissal . . ." (Filing No. 35-10). An employee does not satisfy their employer's expectations when they violate their employment agreement and concede that they should be suspended for doing so. As a result, the Court finds that Rachwalski failed to meet her employer's expectations.

Defendants also argue that Rachwalski cannot satisfy the fourth prong, that "similarly situated employees outside of the protected class were treated more favorably," for any of her claims (Filing No. 36 at 15). Where a plaintiff fails to identify a similarly situated employee who was treated differently, summary judgment is appropriate. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "Whether an employer's treatment of one employee suggests that it discriminated against another employee depends in large part on whether the two employees 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710–11 (7th Cir. 2017).

Rachwalski identifies Poppelriter as a similarly situated male co-worker treated better than her (Filing No. 42 at 32). She argues while off-duty, Poppelriter engaged a group of private citizens smoking marijuana and flashed his FBI credentials, and Brooks did not issue a PQF for Poppelriter for this behavior. Rachwalski also takes issue with the fact that Brooks counseled Poppelriter in the presence of his field training agent, whereas Brooks had her field training agent, Madtson, counsel her for her attire. These arguments fail because to succeed in a discrimination claim, the difference in treatment must be material. *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). "'[M]any day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms or conditions' are not

actionable." *Ziccarelli v. Dart*, 11 C 4909, 2013 U.S. Dist. LEXIS 110588 (N.D. Ill. August 6, 2013) (quoting *Minor*, 457 F.3d at 634). "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437 (7th Cir. 1996).

This is the case here. The fact that Brooks' counseling of Poppelriter occurred verbally and in front of his field training agent while Rachwalski's counseling came directly from her field training agent and then by Brooks, is not a material difference. Both agents were counseled by Brooks concerning compliance with suitability standards, (Filing No. 41-32 at 15:2–11), both agents were recommended for probationary termination due to their lack of suitability, and both agents resigned due to this recommendation (Filing No. 42 at 23–25). Poppelriter is not a comparator who was treated better, so Rachwalski's discrimination claim fails on element four of the McDonnell Douglas framework.

Even if Rachwalski had satisfied the initial hurdle of establishing a four-part prima facie case of discrimination under the *McDonnell Douglas* framework, she cannot show that Defendants' proffered reasons for termination were pretext. A plaintiff can prove pretext by showing that similarly situated employees outside of her protected class who engaged in similar conduct were treated more favorably. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). A plaintiff can also prove pretext by showing that the defendant's proffered reason is unworthy of credence. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001). The Court has already determined that Rachwalski and Poppelriter were not similarly situated. And there is no designated evidence that her proposed resignation or termination was motivated by a discriminatory reason; she was offered to resign or be terminated for the unauthorized disclosure of confidential information.

Rachwalski failed to meet her employer's expectations, failed to establish a similarly situated comparator who was treated better, and has not shown pretext for her termination; so, her sex-discrimination claim fails under the *McDonnell Douglas* framework.

### 3. Causation

This brings the Court to the second pathway Rachwalski may succeed in her discrimination claim—whether the evidence, when viewed as a whole, would lead a reasonable factfinder to conclude that she was terminated because of her sex. *Ortiz*, 834 F.3d at 766. "In discrimination cases, when a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (cleaned up). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, [the Seventh Circuit] made clear . . . that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Id*. (quoting *Ortiz*, 834 F.3d at 766).

Rachwalski's discrimination claim also fails under *Ortiz*. Rachwalski cites a plethora of past wrongs purportedly due to sex discrimination, including being chosen for assignment in the SOG, O'Neal's initial denial for her to participate in the 60-day temporary duty assignment in Chicago, O'Neal's text messages followed by her coworkers' impressions that O'Neal had a history with crossing a line with young, female employees, Brooks' counseling her on the dress code, and Brooks' frustration with her continued telework status (*See* Filing No. 42). She argues that these instances show that she was terminated due to her sex.

But, as discussed above, Rachwalski's claims concerning O'Neal's actions are time barred. This leaves the Court with only Brooks' counseling Rachwalski on her attire, his frustration with

her continued telework status, and whether these instances are sufficient evidence for a reasonable factfinder to determine that she was terminated because of her sex. They are not.

Rachwalski's concession that she expected to be suspended for her unauthorized disclosure of confidential information dooms her discrimination claim. Though a more severe action—asking her to resign to avoid termination—was taken, this discrepancy between her expected consequences and the actual consequences alone does not evidence discrimination. Rachwalski's employment agreement expressly stated that termination for an unauthorized disclosure may occur. Likewise, Rachwalski's concession—that perhaps she misunderstood casual Friday attire when she wore a ball cap, tennis shoes and a jersey into the office—shows that this incident does not evidence sex discrimination. Brooks never mentioned Rachwalski's gender in either the counseling for her attire or the counseling for her unauthorized disclosure; and the record is absent of any indication that Rachwalski's gender was ever mentioned during her employment with Brooks as her supervisor. Moreover, she never complained that she felt discriminated against because of her gender. Rachwalski has designated no evidence, direct or circumstantial, to show that the repercussions stemming from these two instances were based on her sex.

Even if the actions of O'Neal and her claim pursuant to her assignment were not time barred, such circumstances also fail under *Ortiz*. The squad leaders chose squad assignments between two females: Rachwalski and Chelsea. The Court does not view another female being chosen over Rachwalski as her being discriminated against due to her sex. While O'Neal's behavior may have been inappropriate, Rachwalski does not allege an adverse employment action based on O'Neal's conduct. An adverse employment action is "a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits."

*Rhodes v. Ill. DOT*, 359 F.3d 498, 504 (7th Cir. 2004). O'Neal may have initially denied her request to participate in the 60-day temporary assignment in Chicago, but then, that same day, he approved the request.

Rachwalski produced evidence of an unfortunate and tumultuous term of employment with the FBI—she was injured and her first supervisor made her uncomfortable. However, the designated evidence shows that her sex had no role in her termination, and she has not shown that Defendants' reasons for terminating her employment is pretext for discrimination. The Court concludes that the evidence, when viewed as a whole, could not lead a reasonable factfinder to conclude that Rachwalski was discriminated against because of her sex. Rachwalski's claim therefore fails under either pathway and Defendants are entitled to summary judgment on Rachwalski's sex-based discrimination claim.

## C.    **Retaliation Claim**

42 U.S.C. § 2000e-3(a) "prohibits an employer from retaliating against an employee because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (internal quotation marks omitted). "To defeat summary judgment, [a plaintiff] must offer evidence from which a reasonable jury could find: '(1) [she] engaged in an activity protected by the statute; (2) [she] suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.'" *Id*. (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)).

Rachwalski alleges that she was terminated due to the prior protected activity of filing an EEOC complaint (Filing No. 2 at 7). The Defendants argue that Rachwalski's retaliation claim fails because her alleged retaliators had no knowledge of any protected activity (*See* Filing No. 36). Specifically, Defendants argue that they had no knowledge at the time of her termination that

19

Rachwalski's had filed an EEOC complaint—and therefore could not have retaliated against her for that reason. *Id*. at 20. The Court agrees.

"Knowledge of the protected activity is necessary to show causation for a retaliation claim." *Lesiv*, 39 F.4th at 911. For a retaliation claim to reach a jury, "the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity . . . it is not sufficient that a decision-maker could have or even should have known about the employee's complaint." *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512–513 (7th Cir. 2021). Rachwalski initiated EEOC contact on October 18, 2021, ten days after her resignation/termination. An employer cannot have knowledge of a protected activity that has yet to occur at the time of the adverse employment action. As such, Rachwalski's retaliation claim fails.

In a footnote in her response brief, Rachwalski asserts that her August 3, 2021, "dress code email" to Brooks was protected activity, in that she was "calling him out for a double standard in the application of a dress code, because of her sex (female)." (Filing No. 42 at 33 n.9). However, in her email, Rachwalski admits that she misunderstood "casual Friday" attire by wearing a ball cap and jersey to the office (Filing No. 35-19). Her email makes no mention of gender, rather it merely states that she believed she dressed more appropriate than other individuals. Without providing any indication or mention of her protected class, Rachwalski's email does not show that Brooks had actual knowledge of a protected activity. She has failed to meet her burden and summary judgment is therefore **granted** for her retaliation claim.

## D.    <u>Hostile Work Environment Claim</u>

Before addressing Rachwalski's hostile work environment claim, the Court must determine whether her claim was continuous or should be severed into two incidents. This is important because Rachwalski admits, and the Court agrees, that her claims concerning O'Neal's conduct are

time barred (Filing No. 42 at 29). O'Neal ceased supervising Rachwalski in January 2021, and she did not file her EEOC complaint until October 18, 2021, well past the timely filing requirements of 42 U.S.C. § 2000e-5(e)(1) and 29 C.F.R. § 1614.105(a). Accordingly, if O'Neal's actions constitute a separate unlawful employment practice, any allegations related to those actions will not be considered in the analysis of her hostile work environment claim.

The Supreme Court explained in *National R.R. Passenger Corp. v. Morgan*, that while the entire hostile work environment encompasses a single unlawful employment practice, acts bearing no relation to one another belong to separate employment practices. 536 U.S. 101, 117–18 (2002). "*Morgan* also said that 'certain intervening action by the employer' could sever a hostile work environment claim." *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 852 (7th Cir. 2019) (quoting *Morgan*, 536 U.S. at 118). Further, "[a] significant gap between alleged incidents of discriminatory harassment can sever the hostile work environment claim." *Id*. at 852. Though there is no set amount of time, the inquiry is whether "the series of allegations describe continuous conduct rather than isolated incidents." *Milligan-Grimstad*, 877 F.3d at 713.

"A change in managers can affect whether incidents are related. Unlike the actions of co-workers, the actions of supervisors impart vicarious liability to the employer for discriminatory harassment." *Ford*, 942 F.3d at 853. As a result, "[a]n employee moved from one plant to another, where a different set of managers made decisions about working conditions, might well experience different hostile environments for the purpose of *Morgan*." *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007).

"Simply put, § 2000-e5(e)(1) is a provision specifying when a charge is timely filed and only has the consequence of limiting liability because filing a timely charge is a prerequisite to having an actionable claim. A court's task is to determine whether the acts about which an

21

employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Morgan*, 536 U.S. at 120.

Here, Rachwalski alleges two separate hostile work practices—those practices under O'Neal, and those practices under Brooks. O'Neal was Rachwalski's supervisor from October 27, 2019, until January 21, 2021, when LaBuz became her new supervisor. Then, in May 2021, Rachwalski was transferred to a new squad where Brooks became her supervisor. Due to Rachwalski encountering multiple changes in supervisors, along with being transferred to an entirely new squad, Rachwalski's hostile work environment claims should be split into two instances. Further, her hostile work environment claim under O'Neal is based on text messages and an inappropriate conversation between the two of them. These circumstances did not continue to occur under LaBuz's or Brooks' supervision. Her hostile work environment claim concerning O'Neal's conduct is therefore time barred, and the Court may only analyze her claim based on Brooks' actions.

Rachwalski contends that even though her claim concerning O'Neal's conduct is time barred, his actions are relevant for consideration for the reasonableness of her constructive discharge claim (Filing No. 42 at 29 (citing *Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1196 (7th Cir. 1992) (holding that prior acts of racial discrimination not included in the EEOC charge were nevertheless relevant to show the plaintiff's reasonableness in believing he had been compelled to resign)). While the Court does not disagree that it may consider O'Neal's actions for any constructive discharge claim, the Supreme Court and Seventh Circuit have made clear in the authority cited above that hostile work environment claims bearing no relation to one another, especially those acts concerning different supervisors, constitute separate employment practices and therefore, separate hostile work environment claims. Moreover, Rachwalski's briefing fails to

provide any analysis on a constructive discharge claim, so the Court need not make a separate analysis.[3]

This brings the Court to whether Brooks' actions could constitute a hostile work environment. "Title VII prohibits employers from discriminating against employees based on race or gender." *Scaife v. VA*, 49 F.4th 1109, 1110 (7th Cir. 2022) (citing 42 U.S.C. § 2000e-2(a)(1)). "A work environment is hostile under Title VII '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (alteration in original) (internal citation omitted). To succeed on a hostile work environment claim, a plaintiff must show: (1) the environment was both subjectively and objectively offensive; (2) the harassment occurred because the plaintiff was a member of a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014).

"In determining whether the conduct is sufficiently severe or pervasive to be actionable, [courts] look at all of the circumstances, including the frequency of the discriminatory conduct, how offensive a reasonable person would deem it to be, whether it is physically threatening or humiliating conduct as opposed to verbal abuse, whether it unreasonably interferes with an employee's work performance, and whether it was directed at the victim." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013).

---

[3] "[T]o demonstrate constructive discharge, [Rachwalski] must show that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2022). Any constructive discharge claim fails because Rachwalski has not met her burden of showing that her work conditions were unbearable. As Defendants argue, Rachwalski had no plans to resign until Keenan offered her the option to resign in lieu of termination.

Rachwalski argues that Brooks created a hostile environment because she was the only individual he had ever raised the dress code with, he was frustrated by her absence due to her temporary disability, and "to Brooks' way of thinking Plaintiff becoming engaged would anchor Plaintiff to Chicago" and the inference to be drawn is that her marriage would keep Rachwalski drawn to Chicago (Filing No. 42 at 30-31). Defendants argue that her claim fails because these allegations do not amount to objectively offensive conduct and the alleged harassment was not severe or pervasive. The Court agrees.

Rachwalski's hostile work environment claim fails on elements one and three because Brooks' actions were neither objectively offensive nor severe or pervasive. Brooks never made any comments concerning Rachwalski's sex. Rachwalski admitted in her email that she may have misunderstood "casual Friday" attire by wearing a ball cap and jersey. Further, Rachwalski does not assert that other male employees were allowed to wear ball caps and jerseys, but she was not. Rather, she merely asserts that because Brooks counseled her on her attire but had not done so with the other employees, he created a hostile work environment. Such action is not enough to constitute a hostile work environment.

Brooks' frustration with Rachwalski's absence was also nothing more than that—frustration. Brooks told Rachwalski that she may have to return to the office regardless of what her doctor said and that it was better for her to be in the office so that she could assist her squad mates in a face-to-face manner. However, in the same conversation, Brooks apologized for his comments and not providing her with better support, stated that they may be getting off on the wrong foot, and then approved her continued absence. Brooks' expressed frustration followed by his immediate apologizing in the same conversation and ultimately approving Rachwalski's continued telework status was neither objectively offensive nor sufficiently severe or pervasive.

Finally, Rachwalski's assertion that Brooks' knowledge of her engagement "suggests a causal nexus between [her] claims and [her] sex" is misguided (Filing No. 42 at 30). Rachwalski attempts to liken this case to *Lust v. Sealy*, where a supervisor caused the plaintiff, a female employee, to be passed over for a promotion by asking her "why [her husband] wasn't going to take care of her?" and telling her that she wouldn't want to relocate her family. 383 F.3d 580, 583 (7th Cir. 2004). The Seventh Circuit held that the supervisor's sexist attitudes were a causal factor in plaintiff's non-selection. *Id*. *Sealy* is readily distinguishable from the case before the Court. Here, Brooks never made any sexist remarks, Rachwalski's sex was never brought up in any of their interactions and Rachwalski was not passed over for any promotion or opportunity. Accordingly, Brooks' actions do not amount to a hostile work environment and Defendants' Motion for Summary Judgment is **granted** for this claim.

## IV.    CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment (Filing No. 35) is **GRANTED**. Final judgment shall issue separately.

**SO ORDERED.**

Date:    8/21/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Calesia Henson
DOJ-USAO
calesia.henson@usdoj.gov

Denis P Mcallister
Denis P. Mcallister
kogid67@aol.com

Jason P. Snyder
DOJ-USAO
jason.snyder@usdoj.gov